

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------------

RIVERKEEPER, INC.
               Plaintiff,

v.

R.B. SCRAP IRON & METAL, INC.
               Defendant.

------------------------------------------------------------------------------

Case No. 22-4621

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Riverkeeper, Inc., by and through its counsel, hereby alleges:

**I.**

**INTRODUCTION**

1.     This is a civil suit brought under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to address and abate Defendant's ongoing and continuous violations of the Act pursuant to the Act's citizen suit enforcement provisions at CWA Section 505, 33 U.S.C. § 1365.

2.     Defendant discharges polluted stormwater runoff from its scrap metal recycling facility located at 730 Saw Mill River Rd., Yonkers, New York, 10710 (the "Facility") into the waters of the United States without authorization, in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and has failed to obtain coverage under and comply with the conditions of an individual State Pollutant Discharge Elimination System ("SPDES") permit or the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit"),

in violation of CWA Sections 402(p)(3)(A), and 402(p)(4)(A), 33 U.S.C. §§ 1342(p)(3)(A) and (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.     Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the New York Harbor, Long Island Sound, and other receiving waters in this District.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

4.     Defendant's stormwater discharges contribute to this endemic stormwater pollution problem.  Defendant engages in industrial activities such as the storage and processing of scrap metal.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby surface waters.  Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.     On March 31, 2022 Plaintiff provided notice of Defendant's violations of the Act and of its intention to file suit against Defendant to Defendant; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated herein by reference.

7.     More than sixty days have passed since the notice letter was served on Defendant and the state and federal agencies.  Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8.     Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9.     This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. §

1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

11.     Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a non-profit corporation whose mission is to protect and restore the Hudson River from source to sea and safeguard drinking water supplies, through advocacy rooted in community partnerships, science and law. Riverkeeper has approximately 3,100 members in the New York and New Jersey region, many of whom use and enjoy the Saw Mill River.

12.     Plaintiff's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting.  Plaintiff's members use those areas to fish, sail, boat, kayak, swim, birdwatch, photograph, engage in spiritual meditation, view wildlife, and engage in nature study and scientific study, among other activities.  Defendant's discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA.

13.     For example, one Riverkeeper member lives on the Hudson River, approximately four blocks from day lighted sections of the Saw Mill River. This member takes daily walks along both waterbodies and is an active kayaker. This member is participates in community science projects to monitor the Hudson River's water quality near the Saw Mill River outlet.

14.     Another Riverkeeper member residing less than a mile from the Saw Mill River regularly bikes and walks around the Saw Mill River, bird watches, and occasionally kayaks in the area. This member is an active advocate for the protection of park land in Yonkers, and

founded a community group dedicated to this purpose.

15.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

16.     Plaintiff is informed and believes, and thereupon alleges, that Defendant R.B. Scrap Iron & Metal, Inc. ("R.B. Scrap") is a corporation incorporated under the laws of the State of New York, which owns and operates a scrap metal recycling facility at 730 Saw Mill River Rd., Yonkers, New York, 10710.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

## The Clean Water Act

17.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

18.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  A NPDES permit requires dischargers of pollution to comply with various limitations.

19.     NPDES permits are issued by the United States Environmental Protection Agency

("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

20.    In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

21.    The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

22.    The Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  *Id.* § 1311(b)(2)(E)[1] (i.e., the "BCT" standard) (together, the "BAT/BCT Standard").  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

23.    The Clean Water Act further requires any NPDES permit issued by a state to contain any additional limits necessary to ensure compliance with that state's water quality

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

standards.  *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards"), 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

24.      In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

25.      Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.  In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

26.      CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

**Stormwater Permits**

27.      In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

28.      Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

29.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

30.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

31.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

32.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow melt runoff, and surface runoff and drainage.

33.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") code 5093. This SIC code describes "[e]stablishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."  Facilities engaged in these industrial activities must obtain NPDES permit coverage for their stormwater discharges.

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

34.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector*

*General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, N.Y. DEP'T ENVTL. CONSERVATION (Mar. 1, 2018) ("General Permit"). DEC also has the authority to issue SPDES permits for individual applicants.

35. As a state-issued, delegated NPDES permit, the General Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the BAT/BCT Standard. *See* General Permit, Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice").

### The General Permit Framework

36. The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions. All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the CWA's citizen suit provision. 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

37. At the outset, the General Permit establishes eligibility conditions that permittees must meet to obtain coverage. General Permit, Part I. Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent. General Permit, Part I.D.

38. Among other things, when submitting a Notice of Intent, the applicant must identify the specific outfalls through which it will discharge industrial stormwater. A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls. General Permit, Parts I.D.3, I.F.

39. Next, the General Permit contains a variety of substantive limits that all permittees must meet. General Permit, Part II. These include numeric effluent limitations on the

quantity and concentration of pollutants, narrative effluent limitations on pollutants, and compulsory pollution control and minimization practices.  General Permit, Part II.

40.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  *See* General Permit, Part VII.

41.     The General Permit implements the BAT/BCT standard through a combination of general and sector-specific effluent limitations that require the Facility to "minimize" the discharge of pollutants.  *See* General Permit, Part II; Part VII.  The General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice." General Permit, Part II.  BMPs include changes to industrial practices and activities (for example, annual employee training programs) and structural changes to the property (for example, collection basins that reduce stormwater discharged from a facility).

42.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).

43.     The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  *See, e.g.*, General Permit, Part II (outlining mandatory BMPs),

10

Part VII (outlining sector-specific BMPs), Part III.A.7 (requiring documentation of all BMPs installed and implemented at the facility pursuant to Parts II and VII, documentation of all innovative BMPs, and an explanation of any BMPs that have not been installed due to site-specific conditions).

44.     The General Permit sets forth additional non-numeric effluent limits requiring particular BMPs based on the type of industrial activities occurring at a particular facility (the "sector").  *See* General Permit, Part VII.

45.     A permittee must record the BMPs and control measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General Permit, Part III.  The permittee must develop, implement, and continually update this plan to adapt it to changing conditions at the facility.  *Id.*  The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit.  *Id.*  Further the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit—a fully implemented SWPPP is a precondition of coverage.  General Permit, Part I.D.1.a.

46.     To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must track, improve upon, and report upon their performance under the General Permit.  *See* General Permit, Parts IV–VII.

47.     The General Permit requires regular inspections by qualified personnel, including annual comprehensive inspections and quarterly routine inspections, to evaluate the performance and maintenance needs of BMPs, detect leaks, and document any deficiencies in the implementation and/or adequacy of the SWPPP, amongst other things.  General Permit, Parts IV.A–C; *see also id.* Parts II.A.2–3.

48.     The General Permit also requires monitoring of stormwater discharges, including quarterly visual monitoring and periodic sampling for pollutants associated with the facility's industrial sector.  General Permit, Parts IV.D–G, VII.  The General Permit relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (benchmarks) for each pollutant to ensure that permittees are minimizing pollution and complying with the narrative limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

49.     A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

50.     Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), vacated on other grounds, 485 U.S. 931 (1988).

51.     If an inspection or monitoring sample reveals an exceedance, violation, or other issues with the BMPs or the SWPPP, the permittee is required to take and document corrective

actions.  General Permit, Part V.

52.     The results of a permittee's inspections and monitoring must be documented and kept with the SWPPP, and certain reports must be submitted to DEC on a periodic basis. General Permit, Part VI.  This self-reporting is the primary means by which DEC and EPA ensure a facility complies with the General Permit and the Clean Water Act.

### Key Conditions of the General Permit

53.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case.

### SWPPP Requirements

54.     Defendant's SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  General Permit, Part III.A.

55.     The General Permit provides detailed instructions to ensure the SWPPP "documents the practices and procedures [necessary] to ensure compliance with the conditions of th[e General Permit], including the selection, design, installation and maintenance of control measures selected to meet effluent limitations in Parts II and VII."  General Permit, Part III.

56.     Among other things, the SWPPP must include: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location map and a site map identifying the location of the facility and all receiving waters to which stormwater discharges; a description of control measures and best management practices;

schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility.

57.     The General Permit also includes sector-specific SWPPP requirements.  For facilities in Sector N (including Subsector N3), these requirements include, *inter alia*, a program to control materials received for processing; BMPs to minimize contact of particulate matter stored indoors or under cover from contacting surface runoff; BMPs to minimize contact of stormwater runoff with stockpiled materials, processed materials, and non-recyclable wastes; BMPs to minimize contact of residual liquids and particulate matter from materials stored indoors or under cover from coming in contact with surface runoff; a program to control what is received at the facility; measures necessary to minimize contact of surface runoff with residual cutting fluids; BMPs to minimize surface runoff from coming in contact with scrap processing equipment; and measures to minimize stormwater contamination at loading/unloading areas. General Permit, Part VII.N.

58.     For facilities discharging to impaired waterbodies for which the cause of the impairment is a pollutant of concern included in the benchmarks as set forth in Appendix G of the General Permit, a facility must contain the following SWPPP requirements: identification of the impaired waterbody, a list of pollutants of concern that could be discharged causing the impairment, an identification of each area of the facility that generates stormwater discharges associated with industrial activity that creates a reasonable potential to discharges the pollutants of concern, and specific BMPs to minimize the pollutant of concern from being discharged to the impaired waterbody.  General Permit, Part III.D.2.a-d.

Monitoring and Reporting

59.     The General Permit requires operators to collect and analyze samples of industrial

14

stormwater discharges resulting from measurable storm events from every outfall at a facility. The General Permit requires such sampling and analysis to occur twice per year.  General Permit, Parts IV and VI.

60.     The General Permit requires that facilities discharging stormwater to impaired waterbodies conduct additional monitoring.  Facilities in Sector N3 that are discharging to waters impaired for low dissolved oxygen are required to conduct quarterly monitoring of stormwater discharges.  General Permit, Parts IV.F.1.c, IV.F.2, Appx. G.

61.     The General Permit requires that facilities that have an exceedance of a numeric effluent limit, or an exceedance of a benchmark cut-off concentration for a pollutant of concern to an impaired waterbody (i.e. a pollutant that is associated with the impairment), must report the results of the exceedance(s) and the corrective action(s) taken on a Corrective Action form along with the submission of the DMR reporting that exceedance.  General Permit, Parts VI.A.2.b, VI.B (Table VI.1).

62.     The General Permit also requires permittees to conduct regular inspections of the facility and monitoring of stormwater discharges to ensure the BMPs and SWPPP are effectively minimizing the discharge of pollution through stormwater.  General Permit, Part IV.  If deficiencies are identified, corrective actions must be taken and documented.  General Permit, Part V.  Reports of these procedures must be kept with the SWPPP, and certain reports must be submitted to DEC.  General Permit, Part VI.

<u>Corrective Actions</u>

63.     The General Permit requires "corrective actions" to improve BMPs when, *inter alia*, "the benchmark or numeric effluent limit [stormwater] sample results indicate exceedances of the pollutants."   General Permit Part V.A.  A discharger must implement additional structural

15

and non-structural BMPs to prevent a recurrence of those exceedances within 12 weeks.  General

Permit, Part V.A.1.  If the exceedances still continue, the discharger must continue implementing

additional BMPs.  General Permit, Part V.A.4.  Corrective actions are also required if there is

evidence indicating that stormwater discharges "are causing, have the reasonable potential to

cause, or are contributing to a violation of the water quality standards."  General Permit, Part

II.C.1.b.  A failure to take the necessary and required corrective actions is a violation of the

permit.  General Permit, Parts V, II.C.1.b.

### CWA Citizen Enforcement Suits

64.    Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may

commence a civil action in federal court on his own behalf against any person who is alleged to

be in violation of an "effluent standard or limitation" under the CWA.

65.    Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a),

includes an action seeking remedies for an unpermitted discharge in violation of CWA

Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant

to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

66.    Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting

U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further

necessary relief based on such a declaration).

67.    Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

68.    Violators of the Clean Water Act are also subject to an assessment of civil

penalties of up to $59,973 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d),

1365(a); 40 C.F.R. §§ 19.1–19.4.

**V.**

16

## STATEMENT OF FACTS

### Defendant Controls the Industrial Activities at the Facility

69.     On information and belief, the Defendant was incorporated in 1983 and, since then, has operated a scrap metal yard at 730 Saw Mill River Rd., Yonkers, New York, 10710.

70.     Because the Defendant controls the industrial activities that take place at the Facility, the Defendant is responsible for managing stormwater associated with those activities at the Facility in compliance with the CWA.

71.     The Defendant is the person, as defined by CWA Section 502(5), 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

### Defendant's Industrial Activities Expose Pollutants to Stormwater

72.     Defendant's activities at the Facility include but are not limited to the purchase, collection, processing, storage, reshipment, and resale of scrap metal outdoors and the operation and storage of industrial equipment.

73.     In carrying out these activities at the Facility, Defendant stores and handles materials in a manner that exposes them to precipitation and snowmelt.  In particular, Defendant's crushing, processing, recycling, and storing of scrap metal, iron, and other recyclable wastes, storing waste materials outdoors, and maintaining and storing machinery and related parts outside release pollutants onto the Facility property including: car parts; scrap metal; paint; sediment; crushed glass; copper; lead; zinc; nickel; iron; aluminum; arsenic; cadmium; cobalt; silver; mercury; and other metals, as well as non-metal pollutants of concern and numerous other waste materials.

74.     Additionally, Riverkeeper has observed the discharge of stormwater with an oily sheen in stormwater discharged from the Facility and from Defendant's trucks, which are often parked in front of the Facility on Saw Mill River Road.

75.     All of these pollution sources are exposed to precipitation and snowmelt.

76.     In addition to waste residues, these pollution sources also may release fuel, oil, lubricants, PCBs, PAHs, an array of metals, pH-affecting substances, and chemical residues.

77.     These toxic pollutants are often generated in the form of small particulate matter, which settles on the ground and other surfaces that are exposed to stormwater and non-stormwater flows.

78.     Because Defendant fails to adequately shelter and otherwise contain these materials to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, and particulates.

**Defendant Discharges Polluted Stormwater From the Facility Into
Waters of the United States**

79.     During precipitation events, including rainfalls and also snow or ice melt events, polluted stormwater flows freely from the Facility into municipal sewage drains.

80.     The drains, in turn, discharge into the Saw Mill River.

81.     The Saw Miller River, in turn, flows to the Hudson River.

82.     The Saw Mill River and Hudson River are all "waters of the United States."

83.     Defendant's industrial activity at the Facility has caused and continues to cause a "discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12), and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Facility on at least each and every day that there has been a precipitation event greater than 0.1 inches.  (EPA has determined that precipitation greater than

0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of

evaluating stormwater runoff associated with industrial activity. *See, e.g.*, 40 C.F.R. §

122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event)).

### Defendant has not Obtained Permit Coverage for These Discharges

84.     Upon information and belief, the Facility is not covered by an individual SPDES

permit.

85.     Upon information and belief, the Facility was not covered by the General Permit.

86.     Upon information and belief, Defendant has not filed a registration with DEC

seeking General Permit coverage for the Facility.

87.     Upon information and belief, Defendant had not complied with any provisions of

the General Permit.

88.     Accordingly, on March 31, 2022, Riverkeeper sent Defendant via certified mail

the notice of intent to sue described above and attached to this Complaint.

89.     On information and belief, as of the date of filing of this complaint, the Facility

still lacks NPDES permit coverage under the General Permit or a SPDES permit.

90.     Defendant's violations of the CWA at the Facility are ongoing and continuous,

are capable of repetition, and result from the same underlying and inadequately resolved causes.

### VI.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants

### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

91.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

92.     CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

93.     CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

94.     CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

95.     CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

96.     CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

97.     40 C.F.R. § 122.2 defines "waters of the United States" to include, *inter alia*: (i) "All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide"; (ii) "All interstate waters, including interstate 'wetlands'"; (iii) Tributaries to such waters; (iv) Wetlands adjacent to such waters or their tributaries; and (v) "All other waters . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."

98.     CWA Section 402(p), 33 U.S.C. § 1342(p) and the implementing regulation found

20

at 40 C.F.R. § 122.26(a)(1)(i), require facilities discharging stormwater associated with industrial activity to obtain a NPDES permit.

99.     Defendant has discharged and continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

100.    Each and every day on which Defendant discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

101.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

102.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Failure to Apply for NPDES Permit Coverage**

**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

103.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

104.    40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

105.    Since at least April 5, 2017, Defendant has operated and continues to operate a facility that engages in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

106.    Since that time, Defendant has routinely discharged polluted stormwater associated with industrial activity from the Facility to waters of the United States.

21

107.    Therefore, since that time, Defendant has been obligated to apply for coverage under an individual or general NPDES permit.

108.    Once Defendant began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendant failed to apply for permit coverage constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

109.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

110.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**Failure to Implement Adequate Control Measures and Best Management Practices
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

111.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

112.    The General Permit, Parts II.D and VII, requires Defendant to implement mandatory general and sector-specific control measures and BMPs to minimize the discharge of pollutants from the Facility.

113.    Because the industrial activities carried out at the Facility are categorized in SIC Code 5093, Defendant must implement the sector-specific control measures specified in Part VII of the General Permit for Sector N.

114.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant has not implemented adequate control measures or BMPs required by the General Permit.

115.    The pollution prevention and control measures selected to comply with Parts II.D and VII.N of the General Permit must meet the federal BAT/BCT Standard.

116.    Defendant has failed to implement control measures that meet the BAT/BCT Standard at the Facility for its discharges of stormwater associated with industrial activity in violation of Parts II and VII of the General Permit.

117.    On information and belief, Defendant has failed to develop and implement pollution controls equivalent to the BAT/BCT Standard every day since at least April 5, 2017.

118.    Each day upon which Defendant operates the Facility without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## FOURTH CAUSE OF ACTION

**Failure to Develop, Implement, and Make Available an
Adequate Storm Water Pollution Prevention Plan
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

119.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

120.    The General Permit, Part III, requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

121.    As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

122.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

123.    The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VIII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies. Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

124.    The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

125.    The SWPPP must be signed in accordance with Appendix H.8 of the General Permit and, where the facility is active, retained on-site in accordance with Parts III.A.9 and VI.C.  General Permit, Part III.C.1.

126.    The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.  General Permit, Part I.D.1.a.1.

127.    Because the industrial activities carried out at the Facility are categorized in SIC Code 5093, Defendant must include the sector-specific SWPPP elements specified in Part VII of the General Permit for Sector N, in addition to the SWPPP elements set forth in Part III of the General Permit.  General Permit, Part III.A.7.

128.     Under Part III.C.2.c. of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within fourteen (14) days of receipt of a written request."

129.     Plaintiff requested a copy of Defendant's SWPPP on March 31, 2022.

130.     Defendant has not provided a copy of a SWPPP to Plaintiff.

131.     Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant had not developed a SWPPP.

132.     Defendant has failed, and continues to fail, to develop, implement, and maintain compliance with and make available an adequate SWPPP for the Facility as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

133.     Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility and to take the other SWPPP-related actions required by the General Permit is also evidenced by Defendant's failure to implement adequate control measures and BMPs, as set forth above.

134.     Each and every day on which Defendant fails to comply with the General Permit's SWPPP requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

135.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

136.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**

**Failure to Conduct Routine Site Inspections and Comply with**
**General Monitoring, Recordkeeping, and Reporting Requirements**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

137.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

138.    The General Permit requires industrial dischargers to conduct and document comprehensive site inspections at appropriate intervals, but in no event less frequently than once a year.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.  General Permit, Part IV.A.1.  Records of this inspection must be kept for at least five years.  General Permit, Part IV.A.2.

139.    In addition to or alongside the annual comprehensive inspection, industrial discharges must also conduct an annual "dry inspection" to ensure there are no non-stormwater sources being discharged into the stormwater system.  General Permit, Part IV.C.

140.    Qualified personnel must also carry out routine inspections of the facility's stormwater management practices at least quarterly.  General Permit, Part IV.B.  During these inspections, personnel must inspect all areas of the facility where industrial materials or activities are exposed to stormwater, evaluate the performance of stormwater BMPs identified in the facility's SWPPP, and document any deficiencies in the implementation or adequacy of the BMPs.  Such deficiencies must then be addressed through corrective actions under Part V of the General Permit.  General Permit, Part IV.B.4.

141.    In addition to inspections, all covered facilities must conduct multiple types of analytical monitoring, including quarterly visual inspections of stormwater discharges and

26

sampling and laboratory analysis of outfalls from all qualifying storm events.  General Permit, Parts IV.D–F.

142.    Further, Defendant engages in industrial activities that fall within Sector N of the General Permit's classifications of industrial activity, and therefore must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VII of the General Permit.  General Permit, Part VI.F.

143.    Records of these monitoring efforts must be maintained for at least five (5) years from the date of the sample, measurement, report, or application.  General Permit, Part VI.C.2.

144.    Covered facilities are required to report on the results of their monitoring efforts to the DEC, through Annual Certification Reports, Discharge Monitoring Reports, and supplemental reports as necessary.  General Permit, Part VI.A–B.

145.    Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant had not conducted any of the site inspections, monitoring, or sampling required by Part IV of the General Permit.

146.    Defendant has failed, and continues to fail, to comply with the inspection, monitoring, and sampling requirements of the General Permit.

147.    Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant also has failed to retain records and submit monitoring reports as required by Parts IV and VI of the General Permit.

148.    Each and every day on which Defendant fails to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

149.    Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

150.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to the Scrap Metal Recycling Facility Sector**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

151.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

152.    The General Permit contains various requirements specific to scrap metal recycling facilities.  General Permit, Part VII.N.

153.    Defendant has failed, and continues to fail, to comply with these requirements of the General Permit that apply to all scrap metal recycling facilities.

154.    To the extent that Defendant's failure to comply with these sector-specific requirements is not captured in the above Causes of Action, such failure is included here.

155.    Each and every day on which Defendant fails to comply with the General Permit's sector-specific requirements applicable to scrap metal recycling facilities is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

156.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

157.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to Facilities that Discharge to an Impaired Waterbody**

28

**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

158.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

159.    Discharges to an impaired waterbody are not eligible for coverage under the General Permit if the cause of impairment is a pollutant of concern included in the "benchmarks" or "effluent limitations" (as those terms are defined in the General Permit) to which the facility is subject, unless the facility:

    a.   Prevents all exposure to stormwater of the pollutant(s) for which the waterbody is impaired, and maintains all analysis and documentation supporting such eligibility with the SWPPP;

    b.   documents that the pollutant for which the waterbody is impaired is not present on-site, and maintains all analysis and documentation supporting such eligibility with the SWPPP; or

    c.   provides additional information in the SWPPP to minimize the pollutant of concern causing the impairment as specified in Part III.D.2 of the General Permit.

General Permit, Part II.C.2.

160.    The Saw Mill River is an impaired water.

161.    One of the causes of impairment is excessive oxygen demand (and thus low dissolved oxygen in the water).  Chemical Oxygen Demand is a parameter included in the benchmarks to which Defendant's facility is subject under Sector N.

162.    Defendant has not prevented all exposure of substances that create chemical oxygen demand to stormwater.

163.    Defendant has not documented that such substances are not present onsite.

164.    Defendant has not submitted a SWPPP with the additional information specified in Part III.D.2 of the General Permit.

165.    Defendant is violating the requirements of the General Permit related to discharge to impaired waterbodies.

166.    Each and every day on which Defendant violates the General Permit's requirements governing discharges to impaired waterbodies is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342.

167.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

168.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

169.    Wherefore, Plaintiff Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.    Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.    Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

c.    Order Defendant to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual SPDES permit that is at least as stringent);

d.   Order Defendant to take appropriate actions to remediate the harm caused by its violations of the General Permit and the Clean Water Act, to the extent possible;

e.   Order Defendant to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

f.   Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

g.   Award any such other and further relief as this Court may deem appropriate.

Dated this 3rd day of June 2022
New York, New York

Respectfully submitted,

By:  /s/ Edan Rotenberg

Edan Rotenberg
SUPER LAW GROUP, LLC
110 Wall Street
New York, NY 10005

*Attorney for Plaintiff*